### IN THE

# SUPREME COURT OF TENNESSEE,

### FOR THE

# WESTERN DIVISION,

JACKSON, . . . . . . . . . . . . APRIL TERM, 1885..

---

L. A. CANNON *et al. v.* E. M. APPERSON, Ex'r, *et al.*

1. **WILL.** *Condition precedent and subsequent.* No precise form of words is required, to create a condition in a will, but any language suffi-. ciently disclosing the intention will suffice, and whether the condition is precedent or subsequent will depend upon the nature of the thing and the intent to be gathered from the whole instrument.

2. **SAME.** *Same.* A bequest to a legatee provided he would aid in the defense of a particular suit brought against the testator, the *onus* of proof being thrown upon the legatee to prove the fact of such aid to the satisfaction of the executor, in which event the executor is to judge the point and pay the legacy, is a legacy upon a condition precedent.

3. **SAME.** *Condition that legatee aid in defense of suit not void.* Such a condition is not void as against public policy where it is clear that the testator believed in the justice of his defense, and neither in the will nor otherwise required the legatee to render any assistance that was not legal.

4. **SAME.** *Contingent legacy. Will not bear interest. When.* When the condition on which a legacy depends is precedent, the legatee has no vested interest until the condition is performed, and a contingent general legacy will not bear interest until the contingency occurs.

5. **SAME.** *Interest when legacy becomes vested.* If the will directs that the indebtedness of such a conditional legatee to the estate be deducted from the legacy with interest, the interest must be calculated up to the time when the legacy becomes vested and payable.

(553)

6. SAME. *Conditional legacy. When recovery cannot be had.* If the legatee of such a conditional legacy, or the assignee of the legatee, fail to show compliance with the condition, and it is proved that the legatee, in conversations with the executor, so expressed himself as to indicate that his feelings and interests were against the testator, there can be no recovery.

7. SAME. *Same.* If, on the other hand, the proof tends to show that the legatee has been loyal to the estate, ready and willing to aid as required by the will, but has never been called upon to render any particular service, either by the testator or the executor, the condition will be treated as complied with.

·8. SAME. *Discretion of executor subject to revision by court.* The executor being required to decide whether a condition has been complied with or not upon proof, his discretion is not arbitrary but subject to the revision of the courts.

9. SAME. *Legacy of interest.* A legacy which directs the executor, in an event which happens, to loan out the principal and pay the legatee the interest annually as long as he lives "and nothing more," will not carry the principal.

10. SAME. *Indebtedness of legatee. Bankruptcy.* Under a will which directs the indebtedness of the legatee to the testator at his death to be deducted from the legacy, the debt must be deducted although the legatee had, previous to the death of the testator, filed his petition in bankruptcy, but had not then been discharged.

11. SAME. *Legacy to woman and children. Indebtedness of husband cannot be deducted from part of children.* A money legacy to a woman and the children of her body by her then husband, she having two children by the husband at the death of the testator, goes to the mother and children in equal moieties, and, under another provision of the will that if the legatees owe the estate any thing at the testator's death, "either themselves, husbands or wives, it shall be deducted· out of their part of the legacy," the indebtedness of the husband of the legatee cannot be deducted from the children's part of the legacy.

12. SAME. *Executor not allowed to make profit out of funds.* An executor, or other trustee, cannot be allowed to make a profit out of the trust funds in his hands, and his use of the same for his own benefit will be a breach of trust, and he will be charged with simple or compound interest according to circumstances.

-13. SAME. *Same. Same.* He will be charged with simple interest or with profits made, if more than simple interest. An executor, who has used

the money of the estate himself, will be charged with simple interest thereon, although he has not made a profit equal to simple interest; and if he make more than simple interest, he will be charged with the whole profits, either by charging him with compound interest, or in such other manner as will best carry out the principle of giving the beneficiaries all the profits, the beneficiaries in doubtful cases being allowed to elect.

14. SAME. *Same. Interest. Commissions.* An executor, who deposits the money of the estate in his name as executor with a trading firm, consisting of himself and his son-in-law, he having a three-fourths interest in the assets and business, and being the principal manager, commits a breach of trust, and will be charged with interest from the date of each deposit. In this instance, and under the circumstances, the executor was charged with simple interest, and allowed half commissions.

15. SAME. *Executor. Settlement. General account.* The *ex parte* settlements of an executor with the probate court, even if *prima facie* evidence in his favor, may be opened by the legatees or distributees by a bill calling for a general account, without surcharging and falsifying the accounts.

16. ADMINISTRATION. *Personal assets liable for municipal taxes. When.* The personal assets of an estate were and are chargeable with the municipal taxes of the incorporated town in which the personal representative resides.

17. WILL. *Monument.* When the will directed the executor, after all the just debts and liabilities of the testator and funeral expenses were paid, to erect a "suitable monument" to his memory, the discretion of the executor in the matter of the character and cost of the monument will not be interfered with except in the ·case of gross abuse, especially where the residuary legatee, claiming under a charitable bequest, alone objects.

18. EXECUTOR. *Attorney's fee.* An objection to the fees of a counsel paid by the executor cannot be entertained, where the only testimony introduced tends to show the performance of the services and the reasonableness of the compensation, and there is no proof to the contrary, although the court may think that the amount goes to the verge of liberality.

19. WIDOW. *Cannot recall dissent from will.* A widow, who dissents from her husband's will, with full knowledge of the facts, and without any fraud, concealment or improper conduct on the part of the executor, or other persons interested in the estate, cannot recall her dissent, certainly not after an acquiesence of twelve years.

Cannon v. Apperson.

20. SAME. *Debts and expenses of administration.* Under the provisions of the act of 1859, chapter 3 (new Code, section 3252), a widow, who dissents from her husband's will, takes her distributive share of the personalty of the estate after the payment of the debts and expenses of administration.

21. SAME. *Payment of her distributive share by executor.* The executor may pay to the widow and the husband she may afterwards marry, her distributive share of the estate, or any part of it, taking their receipt, even if they have entered into a marriage contract settling upon her the *corpus* of her property then owned or afterwards acquired, especially if the settlement give her a separate estate in the property " as fully and completely as if the marriage were not to take place."

FROM SHELBY.

Appeal from the Chancery Court at Memphis. W. W. McDOWELL, Ch.

TAYLOR & CARROLL for the residuary legatee.

LUKE E. WRIGHT for the widow.

D. H. POSTON and U. W. MILLER for legatees.

MYERS & SNEED and GANTT & PATTERSON for defendants.

COOPER, J., delivered the opinion of the court.

Several cases have been submitted to us, after full argument, growing out of the will of Wade H. Bolton, and the administration of his estate by the defendant, E. M. Apperson, the executor. Bolton died July 20, 1869, having made his will on the 10th of August, 1868, which was duly proved and admitted to record at the August term, 1869, of the probate court of Shelby county. E. M. Apperson was appointed execu-

tor by the will, and qualified as such on August 10, 1869. Bolton died without children, leaving a widow, Lavinia A., who afterwards on August 4, 1871, inter-married with the complainant, Lewis H. Cannon, and he died, pending this litigation, on August 7, 1883. The widow dissented from Bolton's will on September 6, 1869. The testator had been the member of a large trading firm, composed of himself, his brother, Isaac L. Bolton, Tom Dickens and Washington Bolton, and known as Bolton, Dickens & Co., which expired by limitation in 1857. In the year 1868, Sarah W. Bolton, as the personal representative of her late husband, Washington Bolton, then deceased, filed a bill against the other members of the old firm of Bolton, Dickens & Co., for an account of the partnership business. In this suit, Dickens filed a cross-bill for the same purpose. The litigation thus commenced was conducted with great bitterness by the parties, and was the cause of intense personal ill-feeling between the complainant and Dickens on the one side and the testator on the other, and their respective friends and partisans, resulting eventually, pending the suit, in the death by violence of both the testator and Dickens, as well as of several other persons. It is this suit which is so often mentioned in the will of Wade H. Bolton, and which the majority of the legatees were required to aid in defending. It was finally determined by this court at its April term, 1880, in the month of May of that year, the opinion being reported in 4 Lea, 569. Shortly after its determination, Apperson, as executor, paid most of the money legacies, treating

them as conditional and as being then due. The legatees thus paid received the money and gave receipts in full for their respective legacies. They afterwards brought suits against the executor for an account and to recover interest, which suits are now before us on appeal. Two of the legacies the executor refused to pay, upon the ground that the condition upon which they were given had not been complied with, and the further ground that the legatees were respectively indebted to the estate in more than the sum bequeathed. The suits brought to recover these legacies are also before us. The widow of the testator also filed a bill against the executor for a general account, and the adjustment of her rights, and the residuary legatee, made a party to that suit, filed a cross-bill for the same purpose. These bills are also before us. The bills of all the legatees who have appealed were dismissed by the chancellor, and the Referees report that his decrees should be affirmed. An account of the administration was ordered and taken in the suit of the widow, and under the cross-bill of the residuary legatee, and a decree rendered settling the rights of the parties, from which they all appealed. They have also filed exceptions to the report of the Referees, which in effect open the case as between them.

The will was written by the testator himself, but duly acknowledged before, and attested by witnesses, and is in the following words and figures:

I, Wade H. Bolton, at my home place in Shelby county, Tennessee, being in good health, of sound mind and disposing memory, knowing the uncertainty of life

and the certainty of death, make and publish in my office, at home, this as my last will and testament.

First. After all my just debts and liabilities and funeral expenses are paid, it is my will and desire that my ashes may repose at the Pleasant Ridge Church burying ground, three miles below my homestead, and a suitable monument erected to my memory by my executor.

Second. I give and bequeath to my beloved wife, Lavinia Ann Bolton, if she survives my death, a life-time dower in three hundred acres of land on my homestead, Hoboken plantation, in Shelby county, Tennessee, and a fee-simple title in all my personal part of my estate in Tennessee, except my gold watch, money, bonds, bank stocks, and my stock of all description that I die seized and possessed of.

Third. I give and bequeath to Lavinia Ann Bolton, my wife, if she survives my death, ten thousand dollars in money in fee-simple title forever, in addition to my life policy of ten thousand dollars insured in the Carolina Life Insurance Company, at Memphis, Tennessee, for her use and benefit, provided that she does not dissent from this will and involve my estate in unnecessary litigation.

Fourth. I give and bequeath Seth W. Bolton five thousand dollars, provided that he lends an assisting hand and helps to defeat this gigantic swindle that old Tom Dickens and his tool, Sarah W. Bolton, has instituted against his father's estate and mine in the chancery court at Memphis, and the *onus* of proof shall be upon him to show to my executor that he

has done all he could to defeat the same; then my executor shall, in the event if Seth W. Bolton be married, or does marry a white woman of his own choice, shall invest the five thousand. dollars in a piece of land for their use, support and maintenance, title to be made to them and their children of their body. But should Seth W. Bolton remain in celibacy, which he is quite likely to do, my executor is instructed to loan out the five thousand dollars at interest and pay him the interest annually as long as he lives, and nothing more.

Fifth. I give and bequeath to Mary L. Bolton, now the wife of E. C. Patterson, and the children of her body by Patterson, five thousand dollars, provided that her and her husband, E. C. Patterson, does all they can in assisting me to defeat this gigantic swindle of old Tom Dickens and his tool, Sarah W. Bolton, has instituted against I. L. Bolton's estate and mine in chancery court at Memphis, and the *onus* of proof shall be on them to show my executor they have done all they can to defeat the same. In this event my executor shall have five years to pay the same, without being coerced by law.

Sixth. I give and bequeath my niece, Lucassia Bolton, now the wife of Joseph A. Andrews, if she survives my death, five thousand dollars, to be invested in a piece of land for their mutual interest and support, provided her and her husband, Joseph A. Andrews, is my friend and co-worker in helping all they can to defeat this gigantic swindle of old Tom Dickens and Sarah W. Bolton, his tool and ally, in

the fraud against me and Isaac L. Bolton's estate, and the *onus* of proof shall be on them to show my executor they have done all they could to defeat the same.

. Seventh. I give and bequeath my niece, now Miss Wade Bolton, five thousand dollars, provided she is and so remains a true and faithful friend of mine, and does all she can to defeat this gigantic swindle of the old land pirate, Tom Dickens, and Sarah W. Bolton, his ally, against her father's estate and mine in chancery court at Memphis, and the *onus* of proof shall be upon her to show she has done all she could to defeat the same. In this event, my executor shall have full power to judge and pay the money, or invest the same in property for her present and future support. I also give her my gold watch.

Eighth. I give and bequeath my niece, Josephine Bolton, now the wife of the notorious Doctor Samuel Dickens (the Judas of the family), five dollars, one-sixth of what Judas Iscariot got for betraying the Lord. Poor Jo! her cup of iniquity will be full after awhile, if she ever gets time to stop her mad career, trying to help swindle her sister, and her memory will let her mind reflect back upon her childhood days when she sat under the shade-trees and roof of her father and mother, and saw the streaming tears and heard the bitter sobs of her departed mother portraying in the ears of her father that some distant day that old Tom Dickens would swindle them and their children out of all they had and bring them to need and want. The prophecy is fulfilled in 1868, and her daughter Jo. is lending a helping hand.

Ninth. I give and bequeath my niece, Lucinda Bolton, now the wife of Solomon J. Goldsby, five thousand dollars, provided that her and her husband is my friend and co-worker in helping all they can to defeat this gigantic swindle of old Tom Dickens and his tool and ally, Sarah W. Bolton, in the fraud against me and Isaac L. Bolton's estate, now pending in the chancery court at Memphis, and the *onus* of proof shall be upon them to show they have done all they could to defeat the same. In this event, my executor shall have full power to judge and pay this legacy in any time in five years after my death.

Tenth. I give and bequeath my nephew, Josephus Bledsoe, and his sister, Mary Tisen Bledsoe, three thousand dollars each, provided, that him and her is my friend and co-worker in helping all they can to defeat the gigantic swindle of old Tom Dickens and Sarah W. Bolton, his tool and ally, against me and Isaac L. Bolton's estate, and the *onus* of proof shall be upon them to show they have done all they could to defeat the same. In this event, my executor shall have full power to judge and pay the legacy in any time in five years after my death.

Eleventh. I give and bequeath to the widow and children of General Thomas Jonathan Jackson, known as Stonewall Jackson, who fell at the battle of Chancellorsville, Virginia, ten thousand dollars, as history tells me his widow's furniture was sold after his death for debt.

Twelfth. Fidelity is the noblest trait of human beings and should be rewarded, therefore I hereby

give and bequeath to my loyal slaves, now called freedmen, that has stayed with me during the war, and has remained with me on my plantation ever since, in my employ or working my land, and has never left it to work or labor on any other farm, to all these that continue faithful in this way up to my death, I instruct my executor to pay the heads of families of all such, three hundred dollars, and to single ones one hundred dollars each that has no families; to Mary Ann I give five hundred dollars; strict proof to be made to my executor they have complied with the above provisions. The money to be paid all such in three years after my death.

Thirteenth. I hereby instruct my executor, if he thinks best, to sell all my real estate in Tennessee or any other State, everywhere, together with my Hoboken farm, where I reside, reserving the dower of three hundred acres given my wife her lifetime.

Fourteenth. I hereby give and bequeath, after the death of my wife, the three hundred acres of land reserved in the thirteenth clause of this will, to the trustees of the free schools of Shelby county, Tennessee, and their successors in office, forever, for the purpose of erecting a college of learning on the same, and hereby give and donate ten thousand dollars for the purpose of erecting and building a college of learning on the same, to be called Bolton College.

Fifteenth. I give and bequeath the residue and remainder of my estate that is not otherwise donated, if any there be, to be paid over to the chairman or judge of the county court of Shelby county, Tennes-

see, and their successors in office, to be loaned out on interest perpetually, and to applicants on bond and security to be given, and the interest accruing annually to be applied for the education of the poor and orphan white children in the first district of Shelby county, Tennessee, in the college of learning ordered to be erected in the fourteenth clause. This donation shall be perpetual in the hands of the county court as above specified.

Sixteenth. I hereby instruct and empower my executor, if any of the legatees mentioned in this will owes my estate any thing at my death, either themselves, husbands or wives, it shall be deducted out of their part of the legacy, with interest; or if any of them forces unnecessary lawsuits on him in winding up my estate, he shall have the power to charge them with the lawyers' fees in defending the same out of their part of the legacy on the final settlement.

Seventeenth. Should I die before this fraudulent suit of old Tom Dickens, and his tool and ally, Sarah W. Bolton, has instituted against me and Isaac L. Bolton's estate is decided, I want my executor to defend the same to the bitter end, as I know, and the world should know, I don't owe him one cent, or they would not sleep on their rights for eleven years, and myself and Isaac L. Bolton both being solvent, and punctual to pay our debts on demand.

Any of the legatees mentioned in this will coalescing or affiliating, or aiding or abetting in anywise, shape or manner, directly or indirectly, with old Tom

Dickens and Sarah W. Bolton in this gigantic fraudulent suit against me, forfeits all their rights and interest to the legacies bequeathed them in this will, and hereby declare them null and void on sufficient proof made to my executor.

Eighteenth. I hereby make, constitute and appoint E. M. Apperson, of Memphis, Tennessee, executor of this my last will and testament, without security, to see that, this will is carried out faithfully. I also here desire and request of him that he shall publish the same for one month in some daily newspaper in Memphis. I also hereby appoint Beecher & Belcher my attorneys.

Lastly, I hereby revoke all wills and codicils by me heretofore made, and declare this to be my only last will and testament. In witness whereof I hereunto set my hand and seal, at my plantation at home, in Shelby county, Tennessee, this the 10th August, 1868.                                        W. H. BOLTON.

The legacy, under the eleventh clause of the will, to the widow and children of Stonewall Jackson, has been paid, and there is now no controversy in relation to it. The action of the executor in relation to the legacies to the freedmen, under the twelfth item of the will, has been acquiesced in, the legatees having been promptly paid their respective bequests. There is also no controversy as to the rights of the trustees of the free schools of Shelby county, under the fourteenth item of the will, as settled by the chancellor. The executor refused to pay the legacies under the fourth and fifth items, and the liability of the estate

for these legacies is before us. The executor paid
the principal of the legacies under the sixth, seventh,
ninth and tenth items, and the controversy with these
legatees is as to their right to recover interest on their
legacies. The chancellor and the Referees have found
that all of the legacies about which there is any con-
test are conditioned upon the legatees aiding in the
defeat of the "gigantic" lawsuit, and payable only
after the termination of that suit, upon proof made
by the legatee to the satisfaction of the executor, that
the condition had been complied with.

A legacy is conditional when it is made to depend
upon the happening or not happening of some un-
certain event, by which it is either to take place
or be defeated, and the condition may be either prec-
edent or subsequent. No precise form of words is
required to create a condition in a will, but any ex-
pression sufficiently disclosing the intention will have
that effect. And there is no distinction in the matter
of technical words between conditions precedent and
conditions subsequent. "The same words," says Willes,
C. J., "would make a condition either precedent or
subsequent, according to the nature of the thing and
the intent of the party": *Acherley* v. *Vernon*, Willes,
153. The question is whether the testator intend that
a compliance with the requisition, which he has chosen
to annex to the enjoyment of his bounty, shall be a
condition to its acquisition, or merely of its retention.
The construction must depend upon the intention of
the parties as gathered from the instrument and the
existing facts: *Bowder* v. *Walker*, 4 Baxt., 600, 604;

*Thomas* v. *Northcross*, 11 Lea, 345; *Finlay* v. *King*, 3 Pet., 346. A leading distinction is that if futurity is annexed to the substance of the gift, the vesting is suspended, but if it relate to the time of payment, the legacy vests at once: *Furness* v. *Fox*, 1 Cush., 134. A contingent general legacy will not bear interest until the contingency occurs: *Jones* v. *Ward*, 10 Yer., 161; *Darden* v. *Orgain*, 5 Cold., 211, 214; *Ballentine* v. *Wright*, 4 Lea, 32. And when the condition on which the legacy depends is precedent, the legatee has no vested interest until the condition is performed: 2 Williams on Ex., 1358.

No one can read the will in this case without seeing at once that the legacies in controversy were intended by the testator to be made to depend upon a strict compliance with the requisition which he has chosen to annex to the enjoyment of his bounty. The testator has obviously at heart the defense of the "gigantic lawsuit," and the principal, if not the only motive of the gifts, is that the legatees will aid in the defense. Each bequest is followed by the condition preceded by the technical word "provided," and the "*onus* of proof" is thrown upon the legatee to show a performance of the condition to the satisfaction of the executor, who "then" or "in that event" is to judge and pay the legacy. So strong is the intent of the testator on the subject, that he has even provided, by the seventeenth item, that the legacies shall be forfeited after they have become vested, if, on sufficient proof, the executor shall find that the legatee has aided or abetted the other side. In some of the

bequests, five years' time after the testator's death are allowed to the executor to pay the legacies, even if they become vested within that period by performance of the condition.    But this is a mere incidental provision for the benefit of the estate, and has no bearing on the condition of the gift.    There is, as was almost inevitable, some slight difference in the wording of the various items of bequest under consideration, but not enough to leave any doubt as to the condition or the testator's intent.    We concur with the chancellor and the Referees in holding that the condition was annexed to the substance of the gift, and that the legacies did not bear interest until the condition was complied with, and that there could be no compliance until the termination of the "gigantic lawsuit," as to those legatees then living.    The point is made on behalf of some of the legatees that they ought not to be charged with interest on their indebtedness to the estate, the contention being that interest stopped at the death of the testator.    But the direction of the sixteenth item of the will is positive 'that the indebtedness shall be deducted "with interest," and we see no way to avoid the obvious conclusion reached by the chancellor and the Referees.

The proof shows that whatever ~delay occurred, after the termination of the "gigantic lawsuit," in the payment of the principal of the legacies which were paid, was occasioned by the legatees themselves. Our conclusions above cover all the points made in the exceptions to the report of the Referees in the cases in which the legatees seek to recover interest

Cannon *v.* Apperson.

on their legacies. These bills were, therefore, properly dismissed.

The other two bills, filed under these conditional bequests, seek to recover the principal of the legacies, which the executor refused to pay. One of these bills is by the assignee of the legacy to Seth W. Bolton, made by the fourth item of the will. Seth W. Bolton, on August 23, 1876, assigned this legacy, or his interest therein, to his sister Wade, the wife of G. H. Millington, and afterwards died on December 8, 1877. The bill was filed on January 4, 1882, by Millington and wife, claiming under the assignment. The legacy was upon the same condition as the other legacies under consideration, and could only vest upon the performance of the condition. The executor insists that Seth W. Bolton did not comply with the condition, and there is no proof that he did, the *"onus* of proof" being upon him, and, of course, upon his assignee. On the contrary, the executor proves affirmatively conversations with Bolton tending to show that his feelings, and, as he himself said, his interests were with the other side in the "gigantic lawsuit." We see no ground for interfering with the judgment of the executor against the legatee made in accordance with the will. We think also that the indebtedness of Seth W. Bolton to the estate at the death of the testator, which, with interest, largely exceeded any possible claim under the legacy, was properly allowed as a deduction under the will. He had, it is true, previously filed a petition in bankruptcy to be discharged from his debts, but he had not then

received his discharge. He owed the estate at that date the amount of the debt, and cannot be allowed to claim under the will without complying with its conditions. It may be added, that in the event which happened, the continued celibacy of Seth W. Bolton, all that he would have been entitled to, had he lived, was the annual interest on the amount of the legacy during his life. The gift of the interest did not carry the principal of the legacy, for the will directs the executor, should Seth W. Bolton remain in .celibacy, to loan out the principal at interest, and pay him the interest annually as long as he lives, "and nothing more." These words of positive negation limit the gift to the interest during the legatee's life.

The remaining case is based upon the fifth item of the will. That bequest is to "Mary L. Bolton and the children of her body by E. C. Patterson." It is conditioned upon Patterson and wife assisting to defeat the "gigantic lawsuit," the *onus* of proof being upon them to show the executor "they have done all they can to defeat the same." "In this event," adds the . will, "my executors ·shall have .five years to pay the same without being coerced by law." Mary L. Patterson died November 1, 1873, leaving two children by Patterson. The original bill was filed February 22, 1881, in the name of the two children, by their father as next friend. The father died November 8, 1881, and on August 11, 1882, one of the children died. On October 18, 1882, an amended and supplemental bill was filed in the name of the surviving child by his general guardian, and Chas. A.

Millington and Annie V., his wife, the latter being a half sister of the Patterson children, and claiming an interest as a distributee of the deceased child. The bill alleges that Mary L. Patterson and her husband, E. C. Patterson, did do all they could to defeat the gigantic lawsuit, and that the executor had notice thereof. The executor denies that Patterson and wife did all they could to assist in defeating the lawsuit, and avers that they never did any thing. He also claims that E. C. Patterson, at the death of the testator, was indebted to the estate in an amount which, with interest, would largely exceed the legacy. The chancellor found in favor of both of these defenses, and dismissed the bill with costs. Complainants appealed.

The condition that Patterson and wife should assist to defeat the suit, is, as we have seen, a condition precedent, and goes to the whole legacy. The bill avers that they did · assist, and the answer denies the fact. There is no averment that the complainants ever offered to show the executor that Patterson and wife had rendered the required assistance, or that Patterson and wife, or either of them, ever made such a showing. There is no averment that the executor has acted corruptly or . wrongfully in reaching the con-. ·clusion that the condition was not performed. It must be conceded that his action is not a· matter of arbitrary discretion, for he is required to judge upon proof. If, therefore, proof had been offered to him by Patterson and wife, or either of them, or by the complainants, and he had refused to receive it, or had

decided in plain conflict with the proof, the remedy in equity would be clear. And if the court would have the right to revise the judgment reached upon proof, it would equally have jurisdiction to take cognizance of the matter in the first in_tance, especially if the executor has come to an adverse conclusion without proof. But the complainants must be prepared to make out their case, for a court of equity cannot interfere to relieve from the consequence of a failure to perform a condition precedent: *Davis* v. *Angel*, 31 Beav., 223; S. C., 4 DeG., F. & J., 524; on appeal.

The only witness introduced by the complainants on this branch of the case is a lawyer who represented Dickens in this gigantic lawsuit. He says that he cannot recall any instance in which Patterson did any thing to defeat the suit, but he has a strong impression from the general conduct of Patterson that he was the active partisan of the Wade H. Bolton side. He cannot, he adds, give particular facts. Another witness says that Patterson and wife "were both in sympathy with the side of the case that Wade H· Bolton was on." The executor testifies that he never ʻconsidered that Patterson and wife had complied with the conditions of the legacy, or recognized them, or either of them, entitled thereto. Neither Patterson nor his wife, he says, ever did any thing to assist in the defense of the suit, nor did Patterson satisfy him that he had done all that he could, or in fact any thing to aid him in defending the suit; "on the contrary," he adds, "it is my opinion he aided and

abetted the other side." On cross-examination he is asked to state something that Patterson did which caused him to entertain the opinion mentioned. His answer is: "I don't know that I could state any thing positively. I was governed more by his manner and his general conversation." The testimony of these witnesses is a fair set-off, and amounts only to the expression of contrary opinions from general conduct. The wife was a daughter of Isaac L. Bolton, one of Wade H. Bolton's co-defendants in the great suit, and the presumption would be rather in favor of the view of the complainant's witnesses. The question still remains, whether the complainants have shown that their parents did aid in the defense of the famous suit? And the answer depends upon the construction to be put upon the language of the will requiring the aid and assistance of the legatee. Did the testator intend that they should do some positive act in aid of the defense, such as employing counsel, hunting up witnesses, or merely to favor his side, giving no aid and comfort to the enemy, and to do, if called upon by him or his executor, any thing they could in a legitimate way in sustaining the defense? The proof does not show that Bolton in his lifetime ever called upon any of his legatees for active aid or advice. And the executor admits, in his deposition in this case, that neither did he; nor did any of the legatees, even those whom he recognized as loyal, and whose legacies he paid, ever give him any active aid except one whom he names. Obviously the executor understood that all he was to expect from the lega-

tees was loyalty to the testator's side, and an absence of any conduct on their part leaning to the other side. And it is equally obvious from the testimony of the executor himself, that this was all the testator expected. If, indeed, either the testator or the executor had called for active aid in any way, a different question would have been raised. The testimony does not show that Patterson and wife, or either of them, affiliated with the opposing side, or failed to aid the testator's side in the only mode expected or demanded. They were as loyal and as active as the large majority of the other legatees claiming under similar bequests. And we ` see no sufficient reason why the executor should have made a distinction, and pronounced against these legatees in the matter of the condition. It is true E. C. Patterson brought a suit against the estate for a large amount for services rendered Wade H. Bolton in his lifetime, which suit was vigorously fought, to the detriment of the estate. It is also true that Patterson, as the executor testifies, may have made himself personally obnoxious to the executor by rough conduct and persistent demands for what he contended were his rights. But these acts would have nothing to do with the question of compliance or noncompliance with the condition of the will, under which the complainants claim.

In this connection, it may be stated that in this case, as well as in the bill filed for the recovery of the legacy of Seth W. Bolton, the point is made that the condition imposed by the will upon the vesting of these legacies is against public policy, and therefore

void, leaving the legacies to take effect as unconditional. No such point is raised in the other cases by the exceptions to the report of the Referees, and it was unnecessary to notice the point in the Seth W. Bolton case. The will upon its face shows that the testator believed that the "gigantic lawsuit" was brought without sufficient cause, and to use his own words, that he did not owe one cent. The testimony leaves no doubt that such was the opinion of the testator. The presumption would be, under these circumstances, that the aid and assistance required to be given by the legatees was only such as would be strictly legal. There is nothing in the will to the contrary by designating a mode of assistance which would be illegal. Nor does the testimony reveal any thing in the conduct of the testator or the executor towards the legatees tending in a different direction. We cannot infer illegality where none appears. And if the sole motive of the bequests was the performance of the condition, and the condition be against public policy, the gift and condition would be both void: 2 Jar. on Wills, 12.

The executor has shown, by the production of the notes of E. C. Patterson to the testator for money, and other notes of Patterson with the testator thereon as surety, which the testator or executor was compelled to pay, that Patterson was, at the death of the testator, indebted to the estate in an amount exceeding, with interest, the legacy in controversy. This indebtedness was at one time pleaded as a set off to the suit of Patterson against the estate above men-

tioned, but the pleas were abandoned with the consent of the counsel of Patterson. And the subsequent judgment in favor of Patterson, or rather his personal representative, in his suit would not be *res adjudicata* as to the indebtedness, the law as settled in this State not compelling a party to plead his debt by way of set off to an action brought against him by his debtor, the two debts being in no way connected, but entirely independent. If, therefore, upon the death of his wife the legacy in controversy went to the husband *jure mariti*, the present complainants would have no title, and could not recover. Their contention is that the bequest being to "Mary L. Bolton, now the wife of E. C. Patterson, and the children of her body by Patterson," and they being alive at the death of the testator, the legacy went to the mother and children in equal moities, each taking one-third. The bill so states the facts, and the arguments seem to concede them, although there is perhaps no proof that the children were living at the death of the testator. A bequest to a mother and her children, without more, would give an equal interest to each in the legacy: *Gannaway* v. *Tarpley*, 1 Cold., 572; *Crockett* v. *Crockett*, 2 Phill., 553; *Newill* v. *Newill*, L. R., 7 Ch. Div., 253. A slight indication of an intention that the children shall not take jointly with the mother, would give a life estate to the mother with a remainder to the children: *Bunch* v. *Hardy*, 3 Lea, 543; *Beecher* v. *Hicks*, 7 Lea, 209. And the fact that there were no children at the death of the testator would be a sufficient circumstance to require the latter construc-

tion: *Turner* v. *Ivie*, 5 Heis., 222. It is to the interest of the estate to accept the facts as alleged, and the allegation is of course binding upon the complainants. The sixteenth item of the will provides that if any of the legatees owe the estate any thing at the testator's death, "either themselves, husbands or wives, it shall be deducted out of their part of the legacy." The indebtedness of the husband and father could not, under this language, be deducted out of the children's part of the legacy. The chancellor's decree must, therefore, be reversed in this case, and a decree rendered in favor of the complainants for two-thirds of the legacy of $5,000, with interest, from the filing of the original bill.

This brings us to the bill of Lavinia A. Cannon, the widow of Wade H. Bolton, and the cross-bill of the residuary legatee. The principal object of these bills is to obtain an account of the administration of the estate by the executor, and the principal question raised is whether the executor shall be charged with any, and what interest on the funds in his hands.

The personal assets of the estate consisted of:

| | |
|---|---:|
| United States bonds, | $ 57,000 00 |
| Money in bank about (subject to check) | 4,000 00 |
| Money deposited with E. M. Apperson & Co., | 13,139 82 |
| Bonds, notes, etc., bearing interest, of which were collected about | 152,491 47 |
| | $226,631 29 |

The income of the estate in the way of interest on the assets as collected, rents, etc., amounted, in addition, to over $80,000, exceeding the expenses of

37—VOL. 14.

administration by several thousand dollars. The ex-
ecutor paid :

To legatees and the widow, . . . . . . . . . $ 92,745 50
Upon other liabilities of the estate, . . . . .     54,802 68
                                                   ─────────
                                                   $147,548 18

The larger part of the payments to the legatees
was made after the termination of the " gigantic law-
suit" in May, 1880.

The executor returned to the probate court an in-
ventory and supplemental inventory of the assets of
the estate which came to his hands, as to which there
is no complaint.  He made regular settlements with
the clerk of the probate court.  Ten of these settle-
ments were made before the bill of Cannon and wife
was filed on February 15, 1881.  These settlements
were all ex parte, without the notice to the parties
interested prescribed by the Code, sec. 2298, and with-
out the attendance of any of those parties.  In the
first of the settlements, made in July, 1871, the ex-
ecutor is charged with $135,250.93, and credited with
expenditures and commissions amounting to $23,489.43,
showing a balance of debit against him of $111,767.50.
His subsequent settlements up to the last show larger
balances against him, except the fourth settlement, when
the balance was $104,394.80.  The sixth settlement
shows a balance of debit of a little under, and the
seventh settlement a little over $140,000.  The bal-
ance found by the eighth settlement in 1879 is $156,-
931.29.  All of these balances must be increased by
$13,129.82, the amount of money deposited by the
testator with E. M. Apperson & Co., subject to check,

and in their hands at his death, and which money, it is admitted, was not included in any of the settlements made as aforesaid with the clerk of the probate court. The executor was not charged in any of these settlements with interest on the moneys in his hands, or the balances found against him. He is only charged with such interest as he realized in collecting the assets of the estate, and interest on the United States bonds until called in or sold. The money of the estate as collected by Apperson was deposited by him, in his name as executor, with the firm of E. M. Apperson & Co., doing business in the city of Memphis as wholesale grocers, commission merchants and cotton factors. The firm, during the whole time, was composed of E. M. Apperson, the same person as the executor, and G. V. Rambaut, his son-in-law, the former owning a three-fourths interest in the business, and the latter one-fourth. The firm had a very large business, and was in good credit, equal to that of any business house in the city. They deposited the money thus received from Apperson as executor to their credit in bank with their own funds, and drew upon it accordingly. And the proof shows that at some time during every year of the period under consideration the firm were over-checkers in bank to the amount of several thousand dollars. No interest was paid by the firm to the executor for the use of the money of the estate, nor did the executor stipulate with the firm for interest.

No principle is better settled, or founded upon a sounder basis of legal ethics and positive law, than

the principle which declares that whoever undertakes
to act for another in any matter shall not, in the
same matter, act for himself, and this without regard
to the fact whether he has or has not made a profit
by the act.    Equity disallows the measure without
reference to advantages or unfairness, and treats it as
a breach of trust, charging the trustee accordingly:
*Perkins* v. *McGavock*, 3 Hay., 265.    The authorities
are uniform to this effect.    If, therefore, a personal
representative or other trustee use the trust funds
himself, or deposit them to his own credit, or loan
them to a firm of which he is a member, it is a
breach of trust, and the trustee becomes at once charge-
able with interest: *Raphael* v. *Boehm*, 11 Ves., 92;
*Schieffelin* v. *Stewart*, 1 J. Ch., 624; *Governor* v. *Mc-
Ewen*, 5 Hum., 241.    Interest is not chargeable against
administrators and executors as of course, but may be
so charged as the circumstances of the case may jus-
tify.    When the exigencies of an estate require an
executor to keep money by him ; where he has not
unreasonably delayed a settlement of his accounts ;
where he has made promptly a just and true exhibi-
tion of the receipts and disbursements, he is not to
be charged with interest on any accidental amount he
may have had in his hands, and upon which he re-
ceived no interest.    But, on the other hand, if an
executor makes interest he is chargeable with it, and,
as the fact whether he has actually received a profit
from the estate or not can scarcely ever be directly
proved, courts of chancery have adopted certain rules
by which, from the existence of given facts, it is pre-

sumed that a profit was received. Where an execu-
tor uses the money of the estate for himself; where
he keeps the money by him without a reasonable
ground for doing so; where by long delay in settling
his accounts, the use of the money by him may be
inferred; in all such cases interest will be charged,
either simple interest, or compound interest, according to
circumstances: *Turney* v. *Williams*, 7 Yer., 173, 213.
As a general rule executors and administrators are
liable to pay simple interest when they unnecessarily
retain the money in their hands, hold it an unreason-
able time, mix it with their own private funds, use
it in the way of trade, or derive any personal ad-
vantage from it: *Garniss* v. *Gardiner*, 1 Edw. Ch.,
128. And the executor will be charged with simple
interest thereon, although he has not made a profit
equal to simple interest. If he make more than
simple interest, he will be charged with the whole
profits, either by charging him with compound interest,
or in such other manner as will best carry out the
principle of giving the beneficiary all the profits. In
such cases, the court allows simple interest when it is
evident the profits made by the trustee could not have
exceeded that amount. In cases of doubt, the bene-
ciary may elect: *Utica Ins. Co.* v. *Lynch*, 11 Paige,
520. In England an equitable rate of interest, less
than the rate established by law, has sometimes been
charged. No such rule has been adopted in the Uni-
ted States: Perry on Trusts, sec. 468; *Clarkson* v.
*DePeyster*, Hopk. Ch., 424.

It is the final settlement of the personal represen-

tative with the county court, made in the mode pre-
scribed, which is made *prima facie* evidence for the
accounting party by the Code, sec. 2305.    But *ex parte*
settlements, even if *prima facie* evidence, may be
opened by the distributees or legatees and reviewed
by a bill asking for an account generally.    The lega-
tees and distributees are not required to surcharge and
falsify such accounts by the bill, nor are they con-
fined to the errors pointed out.    They are entitled
to an account as of course, by reason of the fidu-
ciary relation existing between them and the personal
representative, at the peril of costs, if the account be
improvidently sought.    Even a settlement in the county
court upon notice will have no greater effect unless
the parties appear:  *Turney* v. *Williams*, 7 Yer., 173,
213.    And any settlement made after the filing of
the bill for an account would not affect the rights of
the complainants at all, unless indeed they appeared
and contested the items, for the obvious reason that
the jurisdiction ' of the chancery court had attached
when the bill was filed.

All the authorities agree, and it is conceded, that
an executor will not be allowed to make a profit out
of trust funds in his hands.    If, therefore, the de-
fendant, Apperson, as executor, had loaned the assets
of the estate to his firm, it is admitted that he would
be required to account for the profits, and would be
chargeable with simple or compound interest, according
to the circumstances, in the absence of proof of the
actual profits.    The contention of the defendant's coun-
sel is, that the case is taken out of the rule by the

Cannon *v.* Apperson.

fact that there was only a deposit of the money with the firm by the defendant as executor. The firm used the money in their business, but so, it is said, does a bank in which money is deposited, and it is argued that the cases are identical.

Banks are financial institutions regulated by law, one branch of whose business is to receive money on deposit subject to check, the money deposited becoming their property, to be used subject to those rules of law or custom which limit the amount used so that a sufficient fund may always be on hand to meet the checks of the depositors. The proof shows that about half the deposits are thus retained at Memphis, the residue being used in the discount of commercial paper, secured by personal endorsement or good collaterals. Experience has shown that banks properly conducted may be run with profit to the bankers and safety to the depositors. Accordingly, they have been recognized as safe depositories for the deposit by trustees of trust funds which the exigencies of the trust require shall be kept on hand. But the recognition has never been extended by the courts to deposits with mercantile firms, as a general rule, for the obvious reason that there are no restrictions, either by law or custom, upon the use of such deposits by such firms, and the whole amount may be used for speculative purposes, or under the exigencies of trade, without any of the safeguards existing in the banking business. No case has been produced in which a general deposit of trust money with a trading firm has been sanctioned by the courts. The nearest case

in point which the able and learned counsel of the executor has found is *Hess'* case, 68 Pa. St., 454. There·an assignee, under an assignment for creditors, whose duty was simply to collect and disburse the trust funds during the fifteen months occupied in winding up the trust, made a number of deposits, in his name as assignee, with a banking firm, and it was held, under the circumstances, that he should not be charged with interest. The court, in so far as the decision turned upon the point that the depository was a banking firm, put the decision upon the ground that, as in the case of incorporated banks, only a certain portion of the fund deposited would be employed in the discount of negotiable paper. But the real point of the case was whether the assignee should be charged with interest because he was a member of the banking firm with whom the money was deposited. The decision was in favor of the assignee, partly because the trust was not of a character requiring the assignee to make interest, partly in view of the other circumstances of the case, but principally because it did not appear what interest the assignee had in the firm. And the court likened the case to that of a deposit by a trustee in an incorporated bank of which he was a stockholder, when his interest in the profit of the transaction might be " inappreciably small." " We do not say," the court add, " that there may not be cases in which the charge of interest at some rate would not be eminently proper. ' Every case of this character must necessarily depend upon its own peculiar circumstances." The case is, therefore, really

Cannon *v.* Apperson.

an authority in principle against the position it is produced to sustain, the facts, or the absence of facts, taking it out of the principle.

No trustee can be allowed to make a profit out of the trust funds in his hands, for that would at once place him in antagonism to his beneficiaries, and offer him a reward to work against them. The temptation would be in the case of an executor, as suggested by Judge Reese in *Turney* v: *Williams*, to make the estate worth more to him than to the legatees. The mere fact that a trustee was a common stockholder in an incorporated bank would not, of itself, charge him with interest for making a deposit as trustee in that bank, if the bank be one in good credit, and such as an ordinarily prudent man might select as a depository in his own business. But it might be otherwise if he were the sole stockholder, or much the largest stockholder. And assuredly the trustee, who was a partner in a private banking firm in which he deposited trust funds, would be chargeable with interest or profits if the deposit were continued for an unreasonable time, or under such circumstances as to show that it was made with a view to profit. And equity must disallow, upon general principles, without reference to advantages or unfairness, the right of a trustee to deposit money with a trading firm of which he is the member, and especially if he be the controlling member in interest and management. It would be to allow him to do indirectly what he could not do directly, loan the money to himself. It would open too wide a door to the unscrupulous to sanction

such a precedent even in the case of a person entirely free from the suspicion of unfairness. The courts can only act upon general rules. The defendant, Apperson, committed a breach of trust in making the deposits in question, and is properly chargeable with interest on the deposits.

There having been a breach of trust, the executor is chargeable with interest at the legal rate, although he may not have made a profit equal to that rate of interest, and ordinarily, as we have seen, the liability of executors is confined to simple interest. To charge him with compound interest, it should appear that the nature of the trust required him to make the funds productive as soon, and to as large an amount, as practicable, in a mode prescribed, or in some other reasonable way, at his discretion, or it must appear directly or inferentially that he has made profits to the extent of compound interest: *Diffendorfer* v. *Winder*, 3 G. & J., 329, *per* Bland Ch. In cases of doubt, the beneficiary may elect to take the profits. In this case, the executor was not required by the will to make the funds productive. He is only chargeable with interest by reason of the use of the funds. It does not appear that the firm of E. M. Apperson & Co. made profits in excess of simple interest. On the contrary, the proof tends to show that in the period from 1869 to 1880, during which there was the financial crash of 1873, followed by years of depression in trade and the value of property, and two successive years of epidemic yellow fever at Memphis, there may have been a loss instead of a profit. It is true the

defendant, when his deposition was taken before the master upon the order of reference for an account, refused, when asked by the complainants, to exhibit the books of the firm, or to make an estimate of profits. Such a refusal in ordinary cases is often treated as a sufficient ground for drawing an inference of fact on the point against the accounting party. Yet the matter was not pressed by the complainants in the court below by applying to the chancellor to compel the witness to produce the books or make the estimate demanded, and we do not think, from the proof adduced, that there is sufficient doubt, in Chancellor Walworth's language, to allow the beneficiaries to elect. We think that substantial justice will be attained by charging the defendant with simple interest on his deposits, as executor, with the firm, the interest to be calculated as in case of partial payments: *Jones* v. *Ward,* 10 Yer., 161. The executor should be similarly charged with interest on the deposit of the testator with the firm remaining at his death. This deposit was allowed to continue as it had been left, and must be treated as if made by the executor after his qualification.

The executor made, as we have seen, a full and satisfactory inventory of the assets of the estate, and yearly settlements of his accounts. No error has been found in these settlements, except an item of interest on United States bonds and premium thereon of $593.43, omitted to be charged, which was pointed out by the executor himself. It is true, the executor failed in his ten settlements to charge himself with

the money on deposit with his firm at the death of
the testator. His excuse that the reason of this fail-
ure was to save the estate from taxation thereon, does
not. indicate a nice sense of what is due to the State
in the matter of public revenue, but is one with the
result of which the complainants cannot find fault.
The deposit was mentioned in the inventory of assets
so that the executor could not escape eventual charge,
and he tells us his intention was to bring it forward
in his final settlement. The estate was large, involved
in debt and heavy litigation. The executor had done
his duty in the collection of assets, and in the de-
fense of suits against the estate. The probate judge
allowed him in his settlements ten per cent. on his
disbursements. Under the circumstances, although or-
dinarily the use of trust funds by a trustee forfeits
the right to compensation, we think he should be al-
lowed half these commissions, to be deducted on the
payments each year of the funds collected. . He will
be allowed no commission on the interest with which
he is now charged. This was the course adopted in
*Diffendorfer* v. *Winder*, 8 G. & J., 311, a similar case.

The executor paid a large amount of taxes on the
personal assets in his hands levied by the municipal-
ity in which he resided. The complainants insist that
the taxes were improperly paid. It is conceded that
the legal title to the property was in the executor,
and that the *situs* of the property for the purpose of
taxation was the domicil of the executor : *Mayor, etc.,*
v. *Alexander*, 10 Lea, 475. But the contention is,
that by the Code, sec. 541, sub-sec. 7, the taxation of

the money of legatees and distributees in the hands. of executors is limited to money "lent or deposited at interest." And the argument being that the money in this case was not lent or deposited at interest. Literally there was no loan or deposit on interest by contract with the executor, if his statements as to the absence of any such contract are to be taken as true. But we have held that what was done was in legal effect a loan or deposit of the money at interest, and, no doubt, the same conclusion would have been reached if a legal contest had been made at the time over the taxes. But the act of January 25, 1870, chap. 81, subjected to taxation " all moneys secured by mortgage or deed of trust, money in actual or constructive possession, money due from solvent debtors, whether by bond, bill single, promissory notes or judgments; also all articles of agreement for the payment of money and accounts on solvent parties bearing interest, owned or possessed by any person or persons whatsoever," as well as money loaned or invested at interest in this State. or any other State or government, including money of orphans, legatees and distributees under twenty-one years of age: T. & S. Rev. Code, secs. 541*g*, 542*g*. And since the adoption of the Constitution of 1870, all property has been taxable for State, county and municipal purposes, except such as is specially exempted by statute: New Code, sec. 600 ; *Railroad Company* v. *State*, 8 Heis., 663, 794; *The State* v. *M. & C. Railroad Company*, 14 Lea, 56. The act of 1873, chapter 118, section 33, moreover, expressly provides: " That persons acting as executors, administrators, guardians,

agents or attorneys, or in any fiduciary capacity whatever, shall make a return of the property, moneys, credits and effects held by them in either of said capacities, separate from their individual returns, and the same shall be listed separately for taxation." The executor was, therefore, properly allowed credit for the municipal taxes paid by him on the property in his hands.

Objection is taken to a credit of $6,000 allowed by the chancellor to the executor for a monument erected over the testator's grave. The objection comes from the residuary legatee alone, the widow having assented to the expenditure. The first item of the will is: "After all my just debts, liabilities and funeral expenses are paid, it is my will and desire that my ashes may repose at the Pleasant Ridge Church burying ground, three miles below my homestead, and a suitable monument erected to my memory by my executor." The testator was in fact buried by his widow in Elmwood cemetery near Memphis before the will was proven or the executor qualified. The monument, selected by the executor as suitable, was, with the advise and approval of the widow, erected in Elmwoood cemetery over the remains. The executor offers, at his own expense, to remove the body and monument to the Pleasant Ridge Church burying ground, a neighborhood burial place adjacent to a country church, if the court should deem it to be his duty to make the removal. The controversy is therefore narrowed down to the question of what ought to be the cost of a "suitable monument" for the deceased. There is no

Cannon *v.* Apperson.

proof in the record to guide us, or aid our judgment. The testator was in some respects a remarkable man, who had accumulated a considerable fortune, a handsome part of which he bequeathed, on account of their pecuniary condition, to the widow and children of one of the most illustrious of the Southern leaders in the civil war, and whose name and fame are dear to all lovers of true greatness everywhere, and a still larger part of which is to go to the support of such charitable purposes as most conduce to the public weal, the education of the future citizens of the Republic. The selection of the monument in reference to its suitability is left entirely to the discretion of the executor. He has certainly been liberal in the outlay, but we cannot say that there has been any such abuse of his discretion as will justify the interference of this court, especially after it has passed the ordeal of the probate and chancery courts, and of the Referees.

Another objection is made to the fees of one of the counsel of the executor in the "gigantic lawsuit." But the proof introduced by the executor goes to show the performance of the services, and the reasonableness of the compensation, and there is no proof to the contrary. Under these circumstances, although the amount goes to the verge of liberality, we do not see how we can interfere.

The widow of the testator, it will be remembered, dissented from her husband's will in September, 1869, and continued in her dissent, so far as appears, until the filing of her amended bill in this cause on

October 4, 1881. That bill cautiously suggests that if it is for her interest she ought to be permitted to withdraw her dissent, but adds that, if she is not entitled to certain notes under the will, "she declines to recall or revoke her dissent." The argument of the widow's counsel on the subject was somewhat in the same uncertain vein. The difficulty of recalling a dissent after the lapse of ten or twelve years was frankly conceded. And we know of no principle upon which the dissent can be recalled at any time, when made with full knowledge of the facts, and without any fraud or concealment or improper conduct by the executor or other persons interested in the estate. All of our authorities agree that if she elects, in such cases, to take under the will her election is final, unless otherwise provided by statute: *McDaniel* v. *Douglas*, 6 Hum., 220; *Malone* v. *Majors*, 8 Hum., 579; *McClung* v. *Sneed*, 3 Head, 223; *Waterbury* v. *Netherland*, 6 Heis., 514. No reason occurs why the election should not be equally onclusive in the converse case.

Conceding that she is bound by her election, the widow contends that she is entitled to her distributive share of the personalty in gross, without any deduction for its proportion of the debts of the estate and expenses of administration. The statute regulating the widow's right in such case is thus worded: " When a husband shall die leaving a will from which the widow dissents, within the time and in the manner now provided by law, and leaving no child, or not more than two, his widow shall be entitled to

one-third part of the personal estate, in addition to her dower in the real estate as now provided by law; but if the husband have more than two children, the widow shall share equally with all the children, she being entitled to a child's part": New Code, sec. 3252. By the Code, sec. 2252, embodying the old law always in force in this State, "every debtor's property, except such as may be specially exempt by law, is assets for the satisfaction of all his just debts." The widow's dower in land is exempt by law, because the right accrues upon marriage or the acquiring by the husband of the realty, and has never been interfered with beyond the positive provisions of the statute law: *Combs* v. *Young*, 4 Yer., 218. No such right has ever existed on the part of the widow in relation to personalty, and it has always been subject to the claims of creditors, unless specially exempted by statute. The Code, sec. 2429, embodies what has always been the law of this State, that "the personal estate as to which any person dies intestate, after the payment of the debts and charges against the estate, shall be distributed," etc. What the widow takes, either as distributee or upon dissent to the husband's will, of the personalty, is the share given "after the payment of the debts and charges against the estate." And this is made perfectly plain by the last clause of the section above quoted, where there are more than two children, in which event she shares equally with all the children, taking a child's part, the child's part being only a distributive share after the payment of debts and charges. Such was the construction put

38—VOL. 14.

upon the act of 1784, and the same construction has been put upon the section cited, which follows the language of the old act.

The widow objects to two credits allowed the executor for payments made by him to her on her distributive share of the personal assets, one payment of $22,079.38 made in 1876, and the other of $32,636.12 made in 1880. But both payments were made to the widow as distributee, and Lewis H. Cannon, her then husband, and formal receipts given therefor. There is not the least pretense for charging the executor with any thing improper in the transactions, what he did being at the instance of the wife and for her accommodation. That she chose to apply the first payment to the wife's indebtedness to E. M. Apperson & Co., about which there is no dispute, cannot affect the validity of the payment. Neither can her deposit of the second payment with E. M. Apperson & Co. upon call, but bearing interest at the rate of six per cent., affect the validity of that payment. The husband and wife were entitled to the money, and the executor had the right to pay it to them, whether there was a marriage contract or not, the husband being the trustee of the wife if there was a contract. Nothing is said in the original or amended bill about any marriage contract, nor, of course, is any relief sought by reason of its terms. But, upon examining the marriage settlement, we find nothing in it to prevent the wife from receiving her distributive share, and disposing of it as she pleased, even by gift to her husband: *Jackson* v. *Rutledge*, 3

Lea, 628; *Scobey* v. *Waters*, 10 Lea, 551, 563. The settlement gives her a separate estate in all of her property, "as fully and completely as if the marriage were not to take place," with power in the husband and wife, by joint deed, to sell any property, the proceeds to be her separate estate. She is, in effect, made a *feme sole* as to her personal property, to do with it as she pleases. The power of disposition by will or deed at her death, or in view of that event, would not affect her power during life: *Lightfoot* v. *Bass*, 8 Lea, 355.

The widow's right to the proceeds of the policy of insurance on her husband's life seems to be clear. The only proof on the subject tends to show that the proceeds of the policy were made payable to her on the face of the instrument, and the money was paid to her by the executor accordingly. In that view, she was entitled to the fund: *Gosling* v. *Caldwell*, 1 Lea, 454; *Scobey* v. *Waters*, 10 Lea, 555.

We think the executor's accounts may be re-cast, in this court, perhaps during the present term, without a remand, upon the principles herein settled. And it is manifestly to the interest of all parties that the litigation should be brought to a close as speedily as possible.

Let a decree or decrees be entered in accordance with this opinion. The costs of the dismissed bills will be paid by the complainants in the respective bills. The costs of the bill of E. S. Patterson and Annie V. Millington will be paid by the executor out of the assets of the estate, and allowed him as a

·credit in his final settlement. The defendant, Apperson, will individually pay the costs of the case of Lewis H. Cannon and wife against him, including the costs of the cross-bill of the residuary legatee.