IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 22, 2004 Session

## PATRICIA ALBRIGHT v. LLOYD A. BUTTON, ET AL.

**Appeal from the Probate Court for Loudon County**
**No. 2619     William H. Russell, Judge**

---

**No. E2003-01591-COA-R3-CV - FILED JULY 20, 2004**

---

This case involves the construction of a will.  Lloyd A. Button, a widower ("the Deceased"), executed his last will and testament on April 1, 2002, while hospitalized at Parkwest Hospital in Knoxville.  Under the heading "Conditional Bequest to Patricia Albright," the Deceased left Ms. Albright his Loudon County residence, one of his automobiles, and "all . . . tangible personal property," except the property mentioned in a specific bequest in the will.  The Deceased died one week later, on April 8, 2002, having never left the hospital.[1]  Ms. Albright sued the personal representatives of the Deceased's estate ("the Personal Representatives") seeking to establish her entitlement to the property left to her in the will.  On cross motions for summary judgment, the trial court granted summary judgment to Ms. Albright.  The Personal Representatives, who are the Deceased's son[2] and Shirley Reno, a residuary beneficiary under the will, appeal.  We reverse and dismiss Ms. Albright's complaint.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Probate Court**
**Reversed; Complaint Dismissed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., joined.  D. MICHAEL SWINEY, J. filed a separate concurring opinion.

John E. Appman, Jamestown, Tennessee, for the appellants, Lloyd A. Button and Shirley Reno, Co-Executor/Executrix of the Estate of Lloyd A. Button, Deceased.

Rex A. Dale and Terry Vann, Loudon, Tennessee, for the appellee, Patricia Albright.

### OPINION

---

[1] The Deceased was in the hospital continuously from March 20, 2002, to the date of his death.

[2] The name of the Deceased's son is also "Lloyd A. Button."  It is not clear whether they shared the same middle name or just the same middle initial.  What is clear is that the son now goes by "Lloyd A. Button."  If he ever used the suffix "Jr.," he apparently dropped it after his father's death.

I.

The Personal Representatives contend on appeal that Ms. Albright is not entitled to summary judgment, but that they are. In general terms, they argue that the legacy to Ms. Albright is conditional and that the conditions were not satisfied. We find that the facts which are material to the resolution of the issue in this case are undisputed. We hold that the Deceased's will, when interpreted as required by well-established precedent, clearly delineates conditions for the gift to Ms. Albright, which, through no fault of her own, were not satisfied.

II.

The pertinent provisions of the Deceased's will are as follows:

5.1 **Conditional Bequest to Patricia Albright**: During my lifetime, PATRICIA ALBRIGHT ("Albright") agreed to provide personal assistance and care-giving to me at my residence until my death because I did not want to become a patient in a nursing home. Albright agreed to provide the following services during my lifetime on an "as needed" basis:

(i) Attend to my needs, including preparation of nutritious, appropriate meals and snacks, house cleaning and laundry;

(ii) Assist me with grooming, bathing, dressing, and personal shopping, as needed;

(iii) Purchase, with funds made available by me, or assist me in purchasing clothing, toiletries, and other personal items for me as needed, taking into account my ability to pay for such items;

(iv) Monitor my physical and mental condition and nutritional needs on a regular basis in cooperation with health care providers;

(v) Arrange for transportation to health care providers and to the physician(s) of my choice, and also arrange for assessment, services and treatment by appropriate health care providers, including but not limited to, physicians, nurses, physical therapists, and mental health specialists as needed for me;

(vi)     Assist me in carrying out the instructions and directives of my health care providers; and

(vii)    In the event I became [sic] bedridden, reside with me at my residence for so long as I remained bedridden, even for the duration of my life, if necessary.

To the extent that Albright has consistently and faithfully provided the services described above, I give, devise, and bequeath to her my personal residence located at 121 Tigitsi Lane, Loudon, Tennessee, one of my automobiles of her choosing, and all of my remaining tangible personal property (after the bequest contained in Section 4.1 above).

5.2 **Disposition of Conditional Bequest If Conditions Are Not Met**: If PATRICIA ALBRIGHT failed to provide personal assistance and care-giving services to me during my lifetime in accordance with all the terms and conditions of Section 5.1 above, or if PATRICIA ALBRIGHT predeceases me, then the automobile and remaining personal property bequeathed to PATRICIA ALBRIGHT as referenced in Section 5.1 above shall be distributed to my sister, DOROTHY MERRIMAN, and the bequest of my personal residence to PATRICIA ALBRIGHT shall lapse and my personal residence shall be distributed as part of my Residuary Estate.

(Capitalization, bold print, and underlining in original). Both sides agree that the gift to Ms. Albright is conditional. They sharply disagree regarding the Deceased's intention with respect to the conditions and – as a natural consequence of that dispute – whether the conditions were satisfied prior to the death of the Deceased.

III.

Tenn. R. Civ. P. 56 addresses motions for summary judgment. In essence, the rule provides that a movant must demonstrate that there are no genuine issues of material fact and that the movant is entitled to a judgment as a matter of law. Tenn. R. Civ. P. 56.04. All of the properly-established facts and reasonable inferences from those facts are to be viewed in a light most favorable to the nonmoving party. **Byrd v. Hall**, 847 S.W.2d 208, 210-11 (Tenn. 1993). Summary judgment is only appropriate in those situations where a reasonable individual, in considering the facts and the reasonable inferences favorable to the nonmovant, could reach only one conclusion. **Robinson v. Omer**, 952 S.W.2d 423, 426 (Tenn. 1997).

IV.

The facts in this case come to us by way of the affidavits of Ms. Albright, Ms. Reno, and J. B. Looper, another of the residual beneficiaries under the will, and the depositions of Ms. Albright, Ms. Reno, and the son of the Deceased. The ultimate issues for us are whether there are material facts in dispute; if not, whether Ms. Albright is entitled to summary judgment; and, if she is not, whether the Personal Representatives are entitled to summary judgment.

We begin our discussion by acknowledging that which is the central inquiry in a case involving the interpretation of a will: What did the testator/testatrix intend by the language used by him/her in the will? That intent controls unless to honor it would violate some rule of law or public policy. *In re Walker*, 849 S.W.2d 766, 768 (Tenn. 1993). It is important to recognize that our inquiry is made within well-defined, somewhat-restrictive parameters. The Supreme Court, in the case of *In re Walker*, addressed this issue thusly:

> [T]he testator's intention must be ascertained from "that which he has written" in the will, and not from what he "may be supposed to have intended to do," and extrinsic evidence of the condition, situation and surroundings of the testator himself may be considered only as aids in the interpretation of the language used by the testator, and "the testator's intention must ultimately be determined from the language of the instrument weighed in the light of the testator's surroundings, and no proof, however conclusive in its nature, can be admitted with a view of setting up an intention not justified by the language of the writing itself."

*Id.* at 768. (quoting *Nichols v. Todd*, 20 Tenn. App. 564, 570-71, 101 S.W.2d 496, 490 (1936) (quoting Sizer's Pritchard on Wills (2d Ed. §§ 384, 387, 388, 409))). When interpreting the meaning of language in a will, we do so by giving that language its ordinary and usual meaning. *In re Estate of Hale*, 704 S.W.2d 725, 727 (Tenn. Ct. App. 1985). The interpretation of a will is a question of law for the court. *Burchfiel v. First United Methodist*, 933 S.W.2d 481, 483 (Tenn. Ct. App. 1996).

The parties agree that, generally speaking, a gift in a will can be made conditional. *See Cannon v. Apperson*, 82 Tenn. 553 (1885). In *Cannon*, the Supreme Court noted that "[a] legacy is conditional when it is made to depend upon the happening or not happening of some uncertain event, by which it is either to take place or be defeated . . . ." *Id.* at 566. Although, "[n]o precise form of words is required to create a condition in a will," the court determined that "any expression sufficiently disclosing the intention will have that effect." *Id.* When construing the condition, courts must look to "the intention of the parties as gathered from the instrument and the existing facts." *Id.* (citation omitted). The legatee who is subject to a condition bears the burden of proving that he/she has complied with the condition. *Id.* at 567.

V.

We will now examine "extrinsic evidence of the condition, situation and surroundings of the testator." ***In re Walker***, 849 S.W.2d at 768. In doing so, we recognize that such extrinsic evidence can be utilized only as an "aid[] in the interpretation of the language used by the [Deceased]" and that such extrinsic evidence, no matter how "conclusive in nature," cannot be used to justify an intention "not justified by the language of the writing itself." ***Id***.

VI.

On the record before us, the following "condition, situation and surroundings of the [Deceased]" are not in dispute.[3] In 1998, Ms. Albright met the Deceased (DOB: October 4, 1926) at a yard sale. Ms. Albright, who then owned a residential and commercial cleaning business, began cleaning the Deceased's house the week after they met. She provided cleaning and other services for the Deceased at his residence up until his last hospitalization in March-April, 2002. When he was sick at home, she provided overnight care, sometimes staying in a bedroom at his house. The parties were romantically involved for an unspecified period of time and actually lived together for two days in 2001, after which Ms. Albright moved out because she did not think it was right.

It is clear beyond any doubt that Ms. Albright provided valuable services for a fee to the Deceased at his house prior to his last hospitalization. During earlier hospitalizations and in his absence from home, she had continued to clean his house and provide other services to him, again all for a fee.

Sometime after the parties met, Ms. Albright and the Deceased orally agreed that, in the event his condition was such as to require around-the-clock care, that he would remain in his residence and she would provide all of the necessary care.[4] While Ms. Albright does not state in her affidavit or deposition precisely what she was to receive in return for her commitment, her complaint alleges that she was to receive, apparently in addition to her normal fee for services rendered, "a vehicle of her choosing" and "the [Deceased's] residence" in Loudon. In her deposition, Ms. Albright did testify as follows regarding the parties' oral agreement:

> [The Deceased] loved me. He wanted me taken care of. And I
> promised him he would never go into a nursing home if I had to take
> care of him 20 years. We knew that down the line I would have to
> give up all my business and be there constantly.

---

[3]When we say "not in dispute," we do not mean that the subject facts are agreed-to by both sides of this litigation. We simply mean that one side or the other has presented properly-verified, admissible-at-trial evidence of certain facts, and those facts are not controverted by evidence presented by the other side.

[4]Ms. Albright thought they entered into the agreement in 1998, but she was not sure about the year.

Ms. Albright acknowledges that the Deceased paid her for all of the services that she provided to him up until he went into the hospital for the last time.

According to the co-executrix, Ms. Reno, she was aware, based upon conversations with the Deceased, that he was afraid of being admitted to a nursing home. Ms. Reno testified that they had discussed possible arrangements that would enable him to avoid going to a nursing home, but she stated she was not aware of the "oral agreement" about which Ms. Albright testified. For the purpose of this appeal, we accept as true Ms. Albright's testimony regarding an oral agreement with the Deceased.

The Deceased also told his son that he was afraid of being admitted to a nursing home. The Deceased's son testified in his deposition with respect to his father's motivations for making the gift to Ms. Albright conditional:

> A     We discussed the options and his fear was that, he had 2 fears, one, he didn't want to end up in a nursing home. He was also afraid that [Ms. Albright] would not continue to care for him in the future. So, therefore, we worked out, we talked about the care of the future to get her to stay around based on her length of service to him, she could eventually end up with the house.
>
> Q     When was that conversation?
>
> A     We started the conversation in Thanksgiving of 2001. We went to the lawyer in March of 2002 to begin the discussion with the lawyer.
>
> Q     So, you had gone to this attorney prior to your dad going in the hospital?
>
> A     Yes.
>
>                     \*   \*   \*
>
> Q     You say that your father expressed a concern that [Ms. Albright] might not continue to care for him?
>
> A     That's true.
>
> Q     Is that the basis for the conditions that are set forth in the will?

A      Yes.

Q      And in talking with you about that arrangement, did he say that he had an agreement with [Ms. Albright] that she would do this, but that his fear was that she might not continue to do it, am I reading you correctly on that?

A      I–no, you're not reading me correctly.

Q      Okay. Did he say that he had an understanding with [Ms. Albright] about caring for him?

A      He told me that she had told him that she would take care of him so that he would not have to go into a nursing home.

* * *

Q      What benefit was to flow to her in exchange for her doing that?

A      Based on the length of time from this point forward that she took care of him that he was in need of nursing home care, in lieu of nursing home care. Not just the regular being around. Based on that length of service that would have replaced the nursing home need, she would build up equity in the house. And that is where we left it with the lawyer and unfortunately he was concerned with the surgery. So, the exact details of that were not—

Q      I was going to say it doesn't speak to those terms in the will.

A      It was, actually, when we talked to the lawyer it was going to be a separate contract.

The Deceased did not execute his will prior to his last admission to Parkwest Hospital on March 20, 2002. He was scheduled for surgery, and he apparently expected to return home. He decided to execute his will during his hospital stay and, as previously indicated, did so on April 1, 2002.

Ms. Albright stated in her affidavit that, after the Deceased executed his will, she complied with the conditions set forth in that document. Specifically, the affiant states as follows:

[W]hile [the Deceased] was in the hospital, I visited him on a regular daily basis for the purpose of ascertaining and over seeing that his

needs were properly being met by either myself or the hospital staff. These needs included, but were not limited to food, personal hygiene, personal affairs, and medical treatment.

\* \* \*

I had a specific daily routine that consisted of calling the nursing station on [the Deceased's] floor to check up on [the Deceased's] medical treatment, sleeping history, eating history and other progress that [the Deceased] had made from the time that I had last called or visited on the prior day. I would then call [the Deceased's] room and talk to [the Deceased] to see how he was feeling, what he needed or wanted me to bring him that day, and to tell [the Deceased] what time I would be coming to the hospital to see him that day.

I have many years experience as a nursing assistant which equipped me with the knowledge necessary to give [the Deceased] baths, assist in pulling him up in bed, shave him, and to change or assist in changing his bed as needed. I made sure each of these "labors of love" for [the Deceased] were consistently and routinely performed for [the Deceased] on a daily basis for each and every day that he was in the hospital . . . .

\* \* \*

I made sure that [the Deceased's] meals were properly selected from the hospital menu. I made sure [the Deceased] had an adequate supply of snacks consistent with his diabetic condition (peanut butter and cheese crackers, mostly). I spoke with his nursing staff about his eating habits. During the last week of his life I cooked and brought to the hospital for [the Deceased] to eat, at his request, fried green tomatoes, okra and cornbread.

\* \* \*

I brought [the Deceased] socks from home to wear for his cold feet and a supply of clean underwear. I took his dirty laundry home and washed it . . . .

I provided [the Deceased's] personal items during his stay in the hospital, including but not limited to toothpaste, tissues, razor and electric razor, comb, hairbrush, and cologne, as well as other personal items he needed . . . .

-8-

I closely monitored his medical progress by speaking with [the Deceased], his physicians and his nurses as described above for his entire stay in the hospital. I made his nursing staff aware of any abnormal behavior [the Deceased] exhibited, such as disorientation or other general and specific complaints [the Deceased] revealed to me . . . . I asked his physicians about [the Deceased's] condition, when [the Deceased] would be able to come home, and calmed and reassured [the Deceased] when he expressed fears.

(Paragraph numbering in original omitted). In his affidavit, Mr. Looper stated that "[f]rom my observations and personal experience, the hospital provided for all of [the Deceased's] needs."

There are certain facts of which this court can take judicial notice. The facts that follow are either

(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

Tenn. R. Evid. 201(b). Parkwest Hospital is located in west Knoxville. Knoxville is located in Knox County. Loudon County is adjacent to, and to the southwest of, Knox County. Essentially all of the services recited as conditions in the Deceased's will are services that would be rendered by a hospital such as Parkwest for individuals admitted to the hospital on an inpatient basis. Regardless of whether the trial court took judicial notice of the foregoing facts, we are authorized to do so. [5] Tenn. R. Evid. 201(f) ("Judicial notice may be taken at any stage of the proceedings.").

## VII.

The Personal Representatives make a number of contentions: first, that the burden is on Ms. Albright, as the conditional legatee, to show that she is entitled to the conditional gift in the will; second, that the language of the will, in the words of the Personal Representatives, "unmistakably requires the active performance of services by [Mrs.] Albright . . . in order to satisfy the condition"; third, that the language of the conditions, being in the conjunctive, requires that *all* conditions, not just some, be satisfied; fourth that the will was focused on future services and not on those that had been performed in the past for a fee; and, finally, that the subject services were to be performed at

---

[5]This is not to say that the trial court did not take judicial notice of these facts. We simply do not know if the lower court did or not. The point is that even if the trial court did not do so, we are still at liberty to judicially notice that which would be generally known in Loudon County or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Tenn. R. Evid. 201(b).

the residence so, again in the words of the Personal Representatives, the Deceased "would not become a patient in a nursing home."

Ms. Albright's general position is that "she satisfied the conditions necessary for the [legacy] to her." She points out that the will provides that the enumerated services are to be provided by her on an "as needed" basis. She contends that the "as needed" language "is not limited by services to be performed only at the residence of the decedent." Ms. Albright again points to the language of the will and argues that the following language located just before the "gift" language is particularly pertinent:

> To the extent that [Ms.] Albright has *consistently and faithfully provided* the services described above, I give, devise, and bequeath
> . . .

(Emphasized language is that which is stressed by Ms. Albright). She argues that this language is not tied into the will's reference to the Deceased's residence. Significantly, Ms. Albright agrees that the period from April 1, 2002, to April 8, 2002, is the relevant "period of time" on which the court must "focus" in order to determine if the conditions have been satisfied.

Ms. Albright further contends that the will is evidence of her oral agreement with the Deceased that she "would care for [him] during his lifetime, and that in return for [her] services," he would leave her certain property.

VIII.

We disagree with the contention of Ms. Albright that the conditions set forth in the will should be viewed in a vacuum, without reference to the following statement in the will:

> During my lifetime, PATRICIA ALBRIGHT ("Albright") agreed to provide personal assistance and care-giving to me *at my residence* until my death because I did not want to become a *patient in a nursing home.*

(Emphasis added). When the language chosen by the Deceased is viewed in the context of the "condition, situation and surroundings of [the Deceased]" leading up to the execution of the will, it is clear to us that the quoted portion of the will is at the core of the Deceased's intention. He did not want to go to a nursing home. If he reached a point where he needed around-the-clock care, *i.e.*, nursing home-type care, he wanted to stay in his residence and wanted Ms. Albright to care for him *there*. This she agreed to do, as shown by testimony and the Deceased's statement in his will to the same effect. In this regard, her testimony is totally consistent with the language of the will. In fact, all of the undisputed material facts before us are fully consistent with the unambiguous language of the will.

Ms. Albright agrees that the critical time frame in this case is the period beginning with the execution of the will on April 1, 2002, and ending with the Deceased's death on April 8, 2002 – a period of one week. If Ms. Albright is to show that she satisfied the conditions, she must show that she did so during this one-week period. She attempts to do so by her affidavit. We agree that she has shown that she "over[saw]" the furnishing of services by hospital personnel; that she stayed in touch with the Deceased's health providers during that one week in April; and that she generally made sure that the Deceased was receiving appropriate care while in the hospital. We further acknowledge that, at his request, she brought to the hospital "fried green tomatoes, okra and cornbread." She obviously was concerned about his welfare and attentive to his needs. We hold, however, that the will contemplated something different, *i.e.*, services to the Deceased *at his home*.

When the Deceased executed his will, he had already been in the hospital for some 12 days. He was no stranger to hospitals, having been previously admitted to a hospital on more than one occasion. From all of this, we can conclude that he executed his will – with the conditional bequest to Ms. Albright – at a time when he knew that of which we have taken judicial notice: essentially all of the services listed as conditions in the will are services that are routinely provided by hospital personnel and other health providers to those who are admitted to the hospital. Equipped with this knowledge, and being ever mindful of his desire to live his remaining days at home rather than in a nursing home, the Deceased, in setting the conditions for Ms. Albright's legacy, had to be focused on a period of time *beginning after he left the hospital*. The only reasonable interpretation of the will is that the conditions – and Ms. Albright's obligation to satisfy them – would only come into play *if* the Deceased left the hospital. Since he never did, the conditions could not be satisfied, and, hence, were not satisfied per the terms of the will. It matters not that Ms. Albright was never afforded an opportunity to furnish the services stated in the will, *i.e.*, prospective services in the Deceased's home. Regardless of why they were not performed, it remains that they were not. Hence, the conditions were not satisfied, and Ms. Albright is not entitled to the property conditionally left to her in the will.

IX.

The judgment awarding Ms. Albright summary judgment is reversed and her complaint is dismissed at her cost, both on appeal and at the trial court level. Summary judgment is hereby awarded to the Personal Representatives. This case is remanded to the trial court for the collection of costs assessed there.

_____
CHARLES D. SUSANO, JR., JUDGE